O

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

PATRICK MAURICE McMILLAN,    )   NO. CV 13-6910-MAN
                     )
          Petitioner,    )   **ORDER:  DENYING HABEAS PETITION;**
                     )   **DISMISSING ACTION WITH PREJUDICE;**
    v.              )   **AND DENYING A CERTIFICATE OF**
                     )   **APPEALABILITY**
M D BITER,             )
                     )
         Respondent.   )
_____)

On September 18, 2013, Petitioner, a California state prisoner, filed a habeas petition, which pleaded three claims ("Petition").  On November 19, 2013, Respondent filed a motion to dismiss the Petition on the ground that it was "mixed," because Ground Two was unexhausted.

On November 21, 2013, the Court[1] issued an Order in which it:  concluded that Ground Two was not fairly presented in Petitioner's appeal and, thus, the claim was unexhausted and the Petition was "mixed"; advised Petitioner of his four options given the "mixed" nature of the Petition; and directed Petitioner to file a response, advising the Court of his elected option.  On December 4, 2013, Petitioner filed a response to the Court's November 21 Order, in which he voluntarily dismissed Ground Two, without prejudice, on the ground that the claim is unexhausted.

---

[1]     As of November 20, 2013, all parties had consented to have this case proceed to final judgment before the undersigned United States Magistrate Judge, pursuant to 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73(b).

On December 6, 2013, the Court ordered Ground Two of the Petition dismissed without prejudice, deemed the Petition to be amended to consist only of Grounds One and Three, and denied the motion to dismiss as moot.

On February 20, 2014, Respondent filed an Answer to the Petition.[2]  On May 9, 2014, Petitioner filed a Response to the Answer.  The matter is fully briefed and under submission to the Court.

## PRIOR STATE PROCEEDINGS

On March 5, 2010, a Santa Barbara County Superior Court jury found Petitioner guilty of first degree residential robbery, first degree burglary with a person present, forcible rape, sexual penetration by foreign object, cruelty to a child by endangering health, and dissuading a witness. The jury also found true numerous gang, personal use of a firearm, and personal infliction of great bodily injury enhancement allegations.  (Lodg. No. 1, Clerk's Transcript ("CT") 564-89.)  In addition, the jury found that Petitioner committed the rape and sexual penetration offenses during the course of a residential burglary within the meaning of California Penal Code § 667.61 (California's "One Strike" law).  (CT 572-75.)  In a separate proceeding outside the presence of the jury, Petitioner admitted, and the trial court found true, allegations that Petitioner had suffered two prior convictions (and related prison terms) within the meaning of California Penal Code § 667.5(b).  (CT 710-12.)  Petitioner thereafter was sentenced to a total term of 38 years plus 57 years to life.  (CT 736-39, 803-06; Lodg. No. 9 at 2.)[3]

---

[2]     Petitioner was tried jointly with a codefendant, Roderick Coleman, whose Section 2254 case is pending in this district (Case No. CV 13-3268-MAN).  The state record is the same in both cases and was lodged in Coleman's habeas case on July 24, 2013 [Docket No. 8] (hereafter, "Lodg.").

[3]     Petitioner and Coleman were tried before separate juries.  Coleman was convicted of most of the same offenses as Petitioner, and Coleman's jury found similar enhancement allegations to be true.  Coleman was sentenced to a total prison term of 26 years plus 25 years

1    Petitioner appealed and raised Grounds One and Three of the Petition. (CT 793; Lodg. Nos.

2    4, 7.) On March 7, 2012, the California Court of Appeal affirmed Petitioner's convictions in a

3    written, reasoned decision, although it reversed his sentence on the dissuading a victim conviction

4    and remanded the case for resentencing on that conviction. (Lodg. No. 9.) Petitioner sought

5    review in the California Supreme Court. (Lodg. No. 10.) On June 13, 2012, the California

6    Supreme Court denied review summarily. (Lodg. No. 12.)

7

8                        **BRIEF SUMMARY OF THE EVIDENCE AT TRIAL**[4]

9

10   "Jane Doe"[5] grew up in Lompoc, California, and was still living there in October 2008. She

11   lived with Troy Grant, her boyfriend, and their son Dante, who was a year and a half old, and

12   Dasha, Grant's child from a previous relationship, who was six years old. (Lodg. No. 3, Reporter's

13   Transcript ("RT") 291-93, 648-49.) Doe had met codefendant Coleman a few times prior to

14   October 15, 2008, including at the home of her friend Bridgette Oliver, but Doe was not Coleman's

15   friend. Doe had not seen Petitioner before October 15, 2008. (RT 344-45.) Oliver was

16   acquainted with Coleman and had seen Petitioner with Coleman on several occasions. (RT 756-

17   57.) Grant went to the same high school as Petitioner and had seen Coleman around, but Grant

18   was not a friend of either man. (RT 650.)

19

20   On October 15, 2008, Grant left home to work a night shift. Doe remained at home and

21   put the two children to bed around 9:30 p.m. (RT 299-300, 655.) Oliver, who was Doe's best

22   friend at the time, was at the house and they watched television. Oliver left around 11:00 p.m.,

23   ─────────────────

24   to life. (CT 700-09, 732-35, 799-802; Lodg. No. 9 at 1-2.)

25       [4]    Additional evidence presented at trial that relates specifically to the issues involved

26   in Grounds One and Three will be discussed below in connection with those claims, rather than
     as a part of this brief summary.

27

28       [5]    The primary victim in this case was referred to at trial as "Jane Doe," and she will
     be referenced by that name or as "Doe" in this Order.

1  and Doe went to bed 15 minutes later.  (RT 300-02.)

2

3      Doe fell asleep but woke when she heard a "fidgeting" sound coming from her front door

4  knob.  She sat up, got out of bed, and heard a "big boom."  Two men ran into the room:  one --

5  who Doe identified as Petitioner -- had a "net" stocking over his face; and the other wore a gorilla

6  mask and was holding a bat and a firearm.  Both men were wearing gloves and referred to each

7  other as "Cuz," a term Doe understood to be a name that members of the Crips gang call each

8  other.  Petitioner grabbed Doe from behind and used his elbow to put pressure on her neck.  (RT

9  301-09, 342-43.)

10

11     The two men demanded money and "weed," *i.e.,* marijuana.  Petitioner was choking Doe

12 so "hard" that she started to lose sight and could not breathe.  Petitioner knelt Doe over the bed,

13 facedown, and told the other man to get something to tie up her feet.  Doe felt someone attempt

14 to tie her ankles with a wire.  (RT 309-11.)  One of the intruders pulled Doe's pants down.  She

15 felt both men's hands on her.  One of the men penetrated her vaginally with his penis, and it was

16 painful.  Thereafter, she was penetrated vaginally by a plastic object.  (RT 311-15.)

17

18     Petitioner stood up and again asked Doe for the location of money and weed, and Doe told

19 him the items were in the car and also in a jacket belonging to Grant.  The man in the gorilla mask

20 obtained a backpack from the car, which contained the marijuana; however, there was no money

21 in Grant's jacket.  Petitioner again asked for money, and Doe told him it was in her son's room,

22 in a jacket in his closet.  During this time, Petitioner had Doe in a chokehold.  He forced her to go

23 to her son Dante's room, and the man in the gorilla mask retrieved the money from a jacket and

24 went outside.  Approximately $1,100 was taken.  Dante was awake as this occurred.  (RT 315-18.)

25 Petitioner took Doe into the hallway and said she had the option of either being tied up or knocked

26 out.  Doe was crying and said, "just let me go."  Petitioner walked her into Dasha's bedroom, knelt

27 her over the bed, and told her to not move and to count to a thousand.  Dasha was awake and

28 crying.  Petitioner left.  (317-19.)

Shortly after Petitioner left Dasha's room, Doe gathered the children and her purse and left in her car.  She called Grant and told him what happened, and he told her to bring the children to his workplace, which Doe did.  All of them then went to the hospital.  Grant called Oliver, who came and stayed with Doe, and Grant took the children to Doe's mother.  (RT 319-21, 657-59.)

Thereafter, a SART (Sexual Assault Response Team) nurse examined Doe.  (RT 330, 333, 846-48.)  Although Doe had difficulty breathing and swallowing, because her throat and neck felt crushed due to the chokehold, she was able to describe the attack and the intruders to Grant.  (RT 332-33, 660, 865, 868.)  Doe had bruising and abrasions in numerous areas of her body, her vaginal area was painful and tender, and the back of her neck was red, swollen, and tender.  (RT 334-38, 859-62, 868-69, 874, 877-79.)  Doe described the incident to the SART nurse and to a police officer who interviewed her at the SART location.  (RT 854-73, 1028-36.)

Doe went to her parents' home after she left the SART location.  Oliver showed up 30 minutes later.  (RT 339.)  Doe described the incident to Oliver, including the assailants' appearances.  They looked at the MySpace website, Doe saw a photograph of Petitioner, and she recognized him as the man who wore the net stocking mask.  Doe called Detective Clancy, who had interviewed Doe at the SART location, and both Doe and Oliver told Clancy that:  when Doe described the assailants, Oliver said she thought she knew who one of them was; Oliver brought up Petitioner's photograph on MySpace; and Doe said right away that the man depicted was one of the assailants.  (RT 340-44, 1064-65.)

Petitioner was arrested on October 17, 2008.  (RT 933-34)  He had $1,250.50 on his person when he was arrested.  (RT 1077.)  Detective Clancy interviewed Petitioner a few days later, and Petitioner stated that:  after he finished work on October 15, 2008, he came to Lompoc to visit with various people, although could not remember who he visited other than Aundrice Dixon; he visited with Dixon until 11:00 p.m., then he went to pick up Gloria Thomas, and they drove to his home in Santa Maria; he and Thomas stayed the night at his Santa Maria home; the

1  next morning, he went to work; and after he finished work, he picked Thomas up at his Santa

2  Maria residence and brought her back to Lompoc, and he then returned to Santa Maria.  (RT

3  1074-76.)

4

5      A week later, Detective DeLauretis interviewed Dixon.  She told him that she had seen

6  Petitioner and Coleman on the afternoon of October 15, 2008, walking through her apartment

7  complex, and they stopped by her residence at around 4:00 or 5:00 p.m.  (RT 941-42.)

8

9      On November 3, 2008, Detectives Clancy and DeLauretis interviewed Thomas.  (RT 948.)

10  Some time after October 16, 2008, Thomas, who had read an article about the crime in the

11  newspaper, asked Petitioner if he was involved, and he responded, "I was not there."  Thomas

12  asked Petitioner if Doe has been raped, and he said, "Not to my knowledge."  (RT 951-52.)

13  Thomas thereafter started to cry during the interview and said she was scared.  She said that,

14  during the same conversation with Petitioner, he told her she needed to get his car and remove

15  some clothing from his house (which she did), and he also said, "We did go in the house."  (RT

16  952-53, 1058.)  Petitioner asked Thomas to get a message to Coleman, who had not yet been

17  located by the police, "to stay where he's at and not come in," and to have her boyfriend give a

18  false alibi for Coleman.  (RT 953-55, 1058.)  Thomas stated that she was not with Petitioner on

19  the evening of October 15, 2008, as he claimed.  (RT 954.)

20

21      Detective Clancy interviewed Oliver on November 4, 2008.  Oliver stated that when she

22  spoke with Doe after the incident and heard Doe's descriptions of the assailants, Oliver believed

23  that Doe was describing Petitioner and Coleman.  Oliver said that Petitioner and Coleman were

24  always together, and around that time frame, she spoke with Coleman daily.  Coleman called

25  Oliver on October 15, 2008, while she was at Doe's house, and again on October 16, 2008, at

26  which time he said "he didn't rape nobody," and she told him to turn himself in.  (RT 755, 1068-

27  70.)  At trial, Oliver denied having told anyone that Coleman matched the description of the

28  second assailant.  (RT 755.)  Oliver testified that when she told Detective Clancy she had advised

Coleman to turn himself in, it "had nothing to do with" the crimes committed against Doe and, instead, related to an outstanding warrant for something else.  (RT 761.)

Coleman confessed that:  he and Petitioner broke into Doe's home, stole marijuana, and attempted to tie Doe up; and that Petitioner physically assaulted Doe, although Coleman denied that either man raped her.  (Lodg. No. 2 at 85-95, 104, 109-10, 112-13, 116-17, 132-36.) Evidence of Coleman's confession was not presented to Petitioner's jury. (RT 988-1000, 1003-13, 1015.)

**PETITIONER'S HABEAS CLAIMS**

In *Ground One*, Petitioner contends that his Confrontation Clause rights were violated by the admission of evidence of pre-offense oral statements made by Coleman and post-offense letters written by and to Coleman.  (Petition at 5 and attachment 1A.)

In *Ground Three*, Petitioner contends insufficient evidence was presented at trial to support the California Penal Code § 186.22(b)(1) criminal street gang enhancement allegations found by the jury to be true.  (Petition at 5-6 and attachment 1C-3C.)

**STANDARD OF REVIEW**

Under 28 U.S.C. § 2254(d), as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a state prisoner whose claim has been "adjudicated on the merits" cannot obtain federal habeas relief unless that adjudication:  "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  *See also* Harrington v. Richter, 131 S. Ct. 770, 784 (2011) ("By its terms § 2254(d)

1  bars relitigation of any claim 'adjudicated on the merits' in state court, subject only to the
2  exceptions in §§ 2254(d)(1) and (d)(2).").

3

4      Clearly established federal law, for purposes of Section 2254(d)(1) review,[6] means Supreme
5  Court holdings in existence at the time of the relevant state court decision. Greene v. Fisher, 132
6  S. Ct. 38, 44-45 (2011); *see also* Cullen v. Pinholster, 131 S. Ct. 1388, 1399 (2011); Richter, 131
7  S. Ct. at 785.  Deference to a state court decision is required absent a Supreme Court decision
8  that either "'squarely addresses'" the issue in the case before the state court or establishes a legal
9  principle that "'clearly extends'" to a new context. Varghese v. Uribe, 736 F.3d 817, 824 (9th Cir.
10 2013) (citation omitted), *cert. denied*, 134 S. Ct. 1547 (2014); Moses v. Payne, 555 F.3d 742, 760
11 (9th Cir. 2009); *see also* Richter, 131 S. Ct. at 786 (it "'is not an unreasonable application of
12 clearly established Federal law for a state court to decline to apply a specific legal rule that has
13 not been squarely established by'" the Supreme Court) (citation omitted).  While circuit precedent
14 is relevant "to ascertain whether [a circuit] has already held that the particular point in issue is
15 clearly established by Supreme Court precedent," circuit precedent may not "be used to refine or
16 sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that [the
17 Supreme] Court has not announced." Marshall v. Rodgers, 133 S. Ct. 1446, 1450-51 (2013) (*per*
18 *curiam*); *see also* Murray v. Schriro, 745 F.3d 984, 997 (9th Cir. 2014) ("Our precedent *cannot* be
19 mistaken for clearly established Supreme Court law.").

20

21     Under Section 2254(d)(1)'s first prong, a state court decision is "contrary to" clearly
22 established federal law if the state court applies a rule that contradicts the relevant Supreme Court
23 holdings or reaches a different conclusion than that reached by the high court on materially
24 indistinguishable facts.  Price v. Vincent, 123 S. Ct. 1848, 1853 (2003).  "Thus, the 'contrary to'
25 prong requires a direct and irreconcilable conflict with Supreme Court precedent."  Murray, 745

26 _____

27      [6]      Petitioner does not contend that Section  Section 2254(d)(2) governs the review of
28 his claims, and there is no basis in the record for applying that provision.  Accordingly, Section
   2254(d)(1) is the governing review standard in this case.

1  F.3d at 997.

2

3      Section 2254(d)(1)'s second, "unreasonable application" prong constitutes an objective

4  standard that is not satisfied merely by finding that a state court erred in applying clearly

5  established federal law.  Richter, 131 S. Ct. at 785; Lockyer v. Andrade, 123 S. Ct. 1166, 1174

6  (2003).  "The question under AEDPA is not whether a federal court believes the state court's

7  determination was incorrect but whether that determination was unreasonable — a substantially

8  higher threshold."  Schriro v. Landrigan, 127 S. Ct. 1933, 1939 (2007) ("AEDPA also requires

9  federal habeas courts to presume the correctness of state courts' factual findings unless applicants

10  rebut this presumption with 'clear and convincing evidence.'"); see also Xiong v. Felker, 681 F.3d

11  1067, 1074 (9th Cir. 2012) (a finding that the state court was incorrect or erroneous is insufficient

12  to warrant habeas relief, because the Section 2254(d)(1) "inquiry is strictly limited to whether the

13  state court's application of clearly established Supreme Court precedent" was objectively

14  unreasonable), cert. denied, 133 S. Ct. 989 (2013).

15

16      "[S]o long as 'fairminded jurists could disagree' on the correctness of the state court's

17  decision," habeas relief is precluded by Section 2254(d).  Richter, 131 S. Ct. at 786 (citation

18  omitted); see also id. at 786-87 (a petitioner is required to prove that the state decision "was so

19  lacking in justification that there was an error well understood and comprehended in existing law

20  beyond any possibility for fairminded disagreement").  "Under § 2254(d), a habeas court must

21  determine what arguments supported or, as [in the case of a silent denial of relief], could have

22  supported, the state court's decision; and then it must ask whether it is possible fairminded jurists

23  could disagree that those arguments or theories are inconsistent with the holding of a prior

24  decision of this Court."  Id. at 786.  A federal court has the authority to issue habeas relief only

25  "where there is no possibility fairminded jurists could disagree that the state court's decision

26  conflicts with [the Supreme Court's] precedents."  Id.; see also Murray, 745 F.3d at 998 ("The

27  deferential standard imposed under AEDPA cloaks a state court's determination with

28  reasonableness, so long as 'fairminded jurists could disagree' as to whether a claim lacks merit.")

1   (citation omitted).

2

3 "AEDPA thus imposes a 'highly deferential standard for evaluating state-court

4   rulings,' . . . and 'demands that state-court decisions be given the benefit of the doubt.'" Renico

5   v. Lett, 130 S. Ct. 1855, 1862 (2010) (citations omitted).  "[T]he purpose of AEDPA is to ensure

6   that federal habeas relief functions as a guard against extreme malfunctions in the state criminal

7   justice systems, and not as a means of error correction." Greene, 132 S. Ct. at 43 (citation and

8   quotation marks omitted); see also Richter, 131 S. Ct. at 786 (the AEDPA standard was intended

9   to be "difficult to meet").  "The petitioner carries the burden of proof." Pinholster, 131 S. Ct. at

10   1398.

11

12 Grounds One and Three of the Petition indisputably are governed by the Section 2254(d)

13   standard of review, because these claims were raised on direct appeal and resolved on their

14   merits.  The Court looks through the California Supreme Court's silent denial to the reasoned

15   decision of the California Court of Appeal resolving both claims on their merits.  Cannedy v.

16   Adams, 706 F.3d 1148, 1158-59 (9th Cir.), amended by 733 F.3d 794, cert. denied, 134 S. Ct.

17   1001 (2013); see also Berghuis v. Thompkins, 130 S. Ct. 2250, 2259 (2010) (when claims were

18   raised on appeal and denied by state court of appeal on their merits in a reasoned decision, and

19   the state supreme court denied discretionary review, the "relevant state-court decision" for

20   purposes of Section 2254(d) review was the state court of appeal decision); Ortiz v. Yates, 704

21   F.3d 1026, 1034 (9th Cir. 2012) (a federal habeas court must "look through state-court summary

22   denials to the last reasoned state-court opinion on the claim at issue," i.e., the California Court

23   of Appeal's decision on appeal affirming the petitioner's conviction).

24   ///

25   ///

26   ///

27   ///

28   ///

1

2

**DISCUSSION**

3   **I.   <u>Petitioner's Confrontation Clause Claim Does Not Warrant Federal Habeas</u>**

4        **<u>Relief</u>.**

5

6        In Ground One, Petitioner contends that he was deprived of his federal constitutional rights

7   to confront and cross-examine witnesses, because evidence was presented of written and oral

8   statements made by and to Coleman before the offenses and after them.

9

10       **A.   <u>Background</u>**

11

12       The California Court of Appeal made extensive factual findings relevant to Ground One.

13  Under 28 U.S.C. § 2254(e)(1), these factual findings are presumed true unless rebutted by clear

14  and convincing evidence. *See, e.g.,* <u>Miller-El v. Cockrell</u>, 123 S. Ct. 1029, 1041 (2003).  As neither

15  party has challenged such findings, and they are consistent with the Court's own review of the

16  record, the Court quotes them below as background for Ground One.[7]

17

18       Prior to trial, [Petitioner] made a motion for severance arguing that admission

19       of certain statements by Coleman would deny him the right to cross-examination if

20       Coleman did not testify.  Coleman joined in the motion arguing that admission of

21       statements by [Petitioner] would have the same effect if [Petitioner] did not testify.

22       The trial court denied severance but ordered separate juries for [Petitioner] and

23       Coleman.

24

25       While in jail awaiting trial, [Petitioner] and Coleman exchanged numerous

26  _____

27       [7]    With respect to the evidence of letters and oral statements, which was admitted at
trial and is described by the California Court of Appeal as quoted above, the Court has interposed
28  bracketed record citations that indicate where in the record such evidence is set forth.

11

written communications referred to as "letters" or "kites."  There were also letters and telephone calls by [Petitioner] and Coleman to third parties.  In motions in limine, the prosecution sought a ruling that the written and telephonic communications were admissible as admissions, adoptive admissions, statements between co-conspirators, evidence giving context to other evidence, and evidence relied on by the prosecution's gang expert.  [Petitioner] and Coleman argued that admission would violate the *Bruton/Aranda* rule and [such communications] were not admissible under any exception to the hearsay rule.  The trial court ruled that the communications were admissible.

Evidence admitted pursuant to the ruling included letters from [Petitioner] to Coleman, letters from Coleman to [Petitioner], letters from [Petitioner] to friends, letters from Coleman to friends, letters from third parties to Coleman, and telephone conversations between [Petitioner], Gloria Thomas and [Grant].  Coleman wrote letters to friends asking the friends to remember their loyalties and help Coleman avoid prosecution for the charged offenses.  Some letters also indicated that he was worried that some people might "snitch" on him.

In one letter to his cousin, Coleman stated:  "Me and Pat [Petitioner] are trying to get out of here. . . .  Will you please write him [unidentified] and tell him to stop being so uptight because me and Pat need you and DeShawn is stepping on our toes by telling you things that you shouldn't do, that we need you to do.  Make sense?  Here is a hint.  LHRT.[8]  Do you even remember what that means? . . .  It's our code word. . . .  So make sure whenever you write or talk to him you refer to what you and your sis and Keyana is doing as the LHR . . . or the get down."  In a

---

[8]     Footnote 4 in original:  "The meaning of 'LHRT' is unclear, but appears to refer to loyalty between Coleman and [Petitioner] and other individuals."

letter to Keyana Coleman, Coleman stated: "But I need you to holla at the boy and let him know they will subpoena his girl. So either they leave town . . . or she must plead the fifth. . . . Since she is the alleged 'victim' and the only witness, my nigga 'P' was like can't make her relive what she supposedly went through. We know she's lying. The DA don't." [*See* RT 1085-86, 1138-39.]

Coleman wrote letters to [Petitioner] about various subjects unrelated to the charges against them but sometimes suggesting knowledge of the crimes. In one letter, Coleman stated: "I really need a female on the outside on the team right now even though she's a slut, she can be of use. LHRT." Coleman told [Petitioner] in another letter that he had written to his lawyer and "gave him the whole spizziel[9] from Point A to Point B. I tried to tell those people I was at my auntie Robi"s house that morning but they didn't want to believe my Black ass. So I put together a story from all the rumors I heard on the streets and gave it to them how I heard myself." [*See* RT 1092, 1129-20.)

[Petitioner] wrote letters to Coleman stating that there was no evidence against them except Coleman's confession. He also referred to attempts to convince other people to help him on the case, and expressed concern that some might falter in their support. In one letter [Petitioner] told Coleman: "My focus has always been GeGe and it still is because that's all that matters. JoJo has been back full swing and she's going to get on it ASAP. As long as GeGe pays that 5,000 bucks its 100. . . . When I say I've been on it, trust me. As far as M and R go, whenever you get at them, just tell them not to say something stupid. Brother, I think things will work out." [Petitioner] wrote to a relative regarding the charges and expressed

---

9       Footnote 5 in original: "Use of 'zz' in a word is a code. The 'zz' should be deleted from the word to discover its true meaning. In other words, 'spizz iel' refers to the word 'spiel.'"

his belief that the charges should be resolved through "street justice" rather than trial. The letter stated: "I'm hoodsta or as you would say gangsta in every essence of the word. I hope to God those 'good people' got through to that dude so he keeps it hood. Yeah, his broad told four different stories and there's no evidence, but with that said I'm still in jail, so my belief remains street justice." [Petitioner] also wrote a letter to Keyana Coleman which asked her to "get O boy's girl's number so you can talk directly to her instead of going through her dude. Speak to her." [*See* RT 1125-26, 1109, 1149-50.]

There was also evidence of verbal and written communications involving Tyrone Leekins. Tyrone Leekins heard [Petitioner] and Coleman discussing a "come up" before the offenses had been committed. Leekins believed that the "come up" referred to an impending robbery. The next day Coleman told Leekins that he had gotten money and marijuana from a "come up on Tip." "Tip" is a nickname for [Grant]. Coleman also wrote letters to Leekins when both men were in jail. The letters told Leekins to get out of protective custody and made vague references to the reason why Coleman was in jail. One letter stated: "I know you didn't expect this. From me, huh. I'm good man. But I'm so good at this lyin ass female that don't testify but about you my cousin wrote this and told me you're in PC. Nigger, I know you're a premiere writer from 805. Please, my nigger, get out of there." Coleman also told Leekins that he wanted the matter to be handled in the "streets" and "100 percent hood." [RT 446-48, 456, 459-60.]

In letters by [Petitioner] to friend Gloria Thomas, [Petitioner] asked Thomas to provide an alibi for him. A few days after the offenses, [Petitioner] and Thomas spoke multiple times on the telephone. [Petitioner] asked Thomas to tell Coleman, who had not yet been arrested, to "stay solid." [Petitioner] stated: "That mother fucker (inaudible) ya mean, but uh. Shit, you know when that — that time comes,

just let that mother fucker know, to stay solid." [Petitioner] also inquired about what the police were doing in the investigation, and whether certain people were saying good or bad things, and to contact certain people to help prepare an alibi. One of the telephone calls took place between Petitioner, Thomas, and victim [Grant]. [Petitioner] asked [Grant]. whether [Grant] was "keeping it street or letting mother fuckers make decisions for you. . . . Like the police." [Petitioner] told [Grant] that [Grant] and his wife were the only people who mattered, and "I'm just saying . . . we're gonna keep it in the street not see what happens. Keeping it street." [Lodg. No. 2, Supplemental Clerk's Transcript ("SCT") 27-28, 43-46.]

(Lodg. No. 9 at 4-6.)

### B.    The Clearly Established Federal Law That Governs Ground One

The Sixth Amendment's Confrontation Clause provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him[.]" U.S. Const. amend. VI.  In Crawford v. Washington, 124 S. Ct. 1354 (2004), the Supreme Court held that the Confrontation Clause bars the admission of "testimonial" out-of-court statements by witnesses not appearing at trial unless either (1) the statements are offered for purposes other than proving the truth of the matter asserted or (2) the witnesses are unavailable and the defendant had a prior opportunity to cross-examine them.  *Id.* at 1364–65, 1369 & n.9.  Critically, however, only "testimonial statements" implicate the Confrontation Clause and Crawford's holding. Davis v. Washington, 126 S. Ct. 2266, 2273 (2006); *see also* Whorton v. Bockting, 127 S. Ct. 1173, 1183 (2007) ("the Confrontation Clause has no application to" an "out-of-court nontestimonial statement").

In Crawford, the Supreme Court declined to define the meaning of "testimonial."  124 S. Ct. at 1374 ("We leave for another day any effort to spell out a comprehensive definition of

1   'testimonial.'").   Subsequent Supreme Court cases suggest, however, that a statement is

2   "testimonial" if its declarant knew, or should have known, that its primary utility was to provide

3   evidence of the defendant's unlawful conduct for use in his prosecution or a criminal investigation

4   into past events.  *See* Williams v. Illinois, 132 S. Ct. 2221, 2242 (2012) ("The abuses that the

5   Court has identified as prompting the adoption of the Confrontation Clause shared the following

6   two characteristics: (a) they involved out-of-court statements having the primary purpose of

7   accusing a targeted individual of engaging in criminal conduct and (b) they involved formalized

8   statements such as affidavits, depositions, prior testimony, or confessions."); Melendez–Diaz v.

9   Massachusetts, 129 S. Ct. 2527, 2532 (2009) (opining that a statement is "testimonial" if it was

10  made for an "evidentiary purpose" and "under circumstances which would lead an objective

11  witness reasonably to believe that the statement would be available for use at a later trial")

12  (internal citation and quotation marks omitted).

13

14      As the Ninth Circuit has observed, Crawford's discussion of what may constitute a

15  testimonial statement was premised on the use of statements "made to a government officer with

16  an eye toward trial, the primary abuse at which the Confrontation Clause was directed." Jensen

17  v. Pliler, 439 F.3d 1086, 1089 (9th Cir. 2006).   "Although *Crawford* did not define 'testimonial' or

18  'nontestimonial,' it made clear that the Confrontation Clause was concerned with 'testimony,'

19  which 'is typically [a] solemn declaration or affirmation made for the purpose of establishing or

20  proving some fact,' and noted that '[a]n accuser who makes a formal statement to government

21  officers bears testimony in a sense that a person who makes a casual remark to an acquaintance

22  does not.'" Delgadillo v. Woodford, 527 F.3d 919, 927 (9th Cir. 2008) (the state court's finding

23  that a victim's statements to her coworkers were not "testimonial" for Confrontation Clause

24  purposes was not contrary to or an unreasonable application of Crawford).

25

26      That said, Supreme Court precedent still does not define "testimonial" and "nontestimonial"

27  statements with precision.  *See* Flournoy v. Small, 681 F.3d 1000, 1004, 1005 (9th Cir. 2012)

28  (stating that Crawford and its progeny fail to "delineate precisely what statements qualify as

1  'testimonial'").  In the absence of a clearly established Supreme Court definition of "testimonial,"

2  a federal habeas court must give state courts "leeway" in their case-by-case applications of

3  <u>Crawford</u> and subsequent decisions.  <u>Yarborough v. Alvarado</u>, 124 S. Ct. 2140, 2149 (2004) ("The

4  more general the rule, the more leeway state courts have in reaching outcomes in case-by-case

5  determinations.").

6

7       Historically, the Confrontation Clause has had a specific application to certain statements

8  made by nontestifying codefendants.  Under what is commonly called the *Bruton* rule, or the

9  *Bruton/Aranda* rule in California cases,[10] the Confrontation Clause may be violated when

10  statements made by a nontestifying codefendant are proffered as evidence *if* such statements

11  directly implicate another defendant who has not, or will not have, an opportunity to cross

12  examine the codefendant regarding the statements.  <u>Bruton</u>, 88 S. Ct. 1620, 1623, 1628 (1968).

13  The *Bruton* rule applies even if the jury is instructed to consider the nontestifying codefendant's

14  statements only against him.  *Id.*  The *Bruton* rule assumes that the statement by the

15  nontestifying codefendant, on its face, "expressly" implicates the other defendant; if it does not,

16  or only implicates the other defendant when linked with evidence introduced later at trial, the rule

17  has no application.  <u>Richardson v. Marsh</u>, 107 S. Ct. 1702, 1707-09 (1987).

18

19      In <u>Bruton</u>, the government did not attempt to use the confession of Bruton's codefendant

20  as evidence against Bruton himself because, under the prevailing rules of evidence, the confession

21  constituted inadmissible hearsay if used against Bruton.  The Supreme Court noted this distinction

22  and expressly reserved the question of whether the Confrontation Clause is violated by the

23  admission of one defendant's extrajudicial statements *against* his codefendant at their joint trial

24  under an exception to the hearsay rule:

25

26

27 _____

28        [10]    <u>Bruton v. United States</u>, 88 S. Ct. 1620 (1968), and <u>People v. Aranda</u>, 63 Cal. 2d 518 (1969).

1
2
3
4
5

> We emphasize that the hearsay statement inculpating petitioner was clearly inadmissible against him under traditional rules of evidence. . . . There is not before us, therefore, any recognized exception to the hearsay rule insofar as petitioner is concerned and we intimate no view whatever that such exceptions necessarily raise questions under the Confrontation Clause.

6

7   Bruton, 88 S. Ct. at 1623 n.3 (citations omitted); *see also* United States v. Arceneaux, 437 F.2d
8   924, 927 n.5 (9th Cir. 1971) ("Bruton expressly refrained from the expression of an opinion in
9   cases where the hearsay rule is not violated."); United States v. York, 933 F.2d 1343, 1362 n.3
10  (7th Cir. 1991) ("*Bruton* only prohibits the use of an inculpatory hearsay statement against an
11  accused when the jurisdiction's rules of evidence do not permit the statement to be introduced
12  into evidence against the accused.  Where the rules so permit, *Bruton* is inapplicable."), *overruled*
13  *on other grounds by* Wilson v. Williams, 182 F.3d 562 (7th Cir. 1999); People v. Smith, 135 Cal.
14  App. 4th 914, 922 (2006) (the *Bruton* rule "presumes the statement is an admissible admission
15  by the declarant and inadmissible hearsay against the codefendant . . ., [and] if the statement is
16  *admissible* against the codefendant under a hearsay exception, and its admission otherwise
17  survives confrontation analysis, then the jury may consider it against the codefendant; no reason
18  exists for severance or redaction").

19

20      Bruton was decided over 25 years before the Supreme Court, in Crawford, effected a sea
21  change in Confrontation Clause jurisprudence by refocusing the constitutional litmus test on
22  whether a statement was "testimonial," as opposed to whether it passed the previously applicable
23  "indicia of reliability" test.[11]  As the California Court of Appeal correctly recognized in Petitioner's

24

25      [11]    Prior to Crawford, it was clearly-established federal law that, if a declarant was
26  unavailable, his statement was admissible only if it bore "adequate indicia of reliability." Ohio v.
    Roberts, 448 U.S. 56, 65-66, 100 S. Ct. 2531, 2539 (1981).  The requisite indicia of reliability
27  could be established when the evidence fell within a firmly rooted hearsay exception or there was
    a showing of "'particularized guarantees of trustworthiness'" with respect to the statement at
28  issue. Idaho v. Wright, 110 S. Ct. 3139, 3146 (1990); *see also* Lilly v. Virginia, 119 S. Ct. 1997,

1    appeal, there is a "developing body of law that *Bruton* [does] not apply to non-testimonial

2    statements at all." (Lodg. No. 9 at 7 n.6.)  To date, the federal circuit courts have concluded that

3    <u>Bruton</u> must be applied in the light of <u>Crawford</u>, and thus, the *Bruton* rule does not apply at all

4    when the codefendant's statement is nontestimonial.  *See, e.g.,* <u>Smith v. Chavez</u>, 2014 WL

5    1229918, at *1 (9th Cir. March 4, 2014) (because the out-of-court statement by the nontestifying

6    codefendant -- an account of the crime given to his girlfriend in a motel -- "was clearly not

7    testimonial," it was reasonable for the state court to reject a <u>Bruton</u> claim, "given that *Bruton's*

8    core holding relies on the Confrontation Clause" and <u>Crawford</u> teaches that the Confrontation

9    Clause bars only testimonial out-of-court statements); <u>United States v. Dargan</u>, 738 F.3d 643, 651

10   (4th Cir. 2013) (a finding that a codefendant's statements were nontestimonial "dispatch[ed]" a

11   defendant's <u>Bruton</u> claim, because:  "*Bruton* is simply irrelevant in the context of nontestimonial

12   statements.  *Bruton* espoused a prophylactic rule designed to prevent a specific type of

13   Confrontation Clause violation.  Statements that do not implicate the Confrontation Clause, *a*

14   *fortiori*, do not implicate *Bruton*."); <u>United States v. Figueroa</u>, 729 F.3d 267, 276 n.14 (3d Cir.

15   2013) ("The protections of the Confrontation Clause and *Bruton* apply only to testimonial

16   statements."); <u>United States v. Figueroa-Cartagena</u>, 612 F.3d 69, 85 (1st Cir. 2010) ("It is thus

17   necessary to view *Bruton* through the eyes of *Crawford* and *Davis*.  The threshold question in

18   every case is whether the challenged statement is testimonial. If it is not, the Confrontation Clause

19   has 'no application.'" (citation omitted)); <u>United States v. Smalls</u>, 605 F.3d 765, 768 n.2 (10th Cir.

20   2010) ("the *Bruton* rule, like the Confrontation Clause upon which it is premised, does not apply

21   to nontestimonial hearsay statements"); <u>United States v. Dale</u>, 614 F.3d 942, 958 (8th Cir. 2010)

22   ("Reading *Bruton* in light of *Crawford*, we conclude that a *Bruton* violation must be predicated on

23   a *testimonial* out-of-court statement implicating a co-defendant."); <u>United States v. Johnson</u>, 581

24   F.3d 320, 326 (6th Cir. 2009) ("Because it is premised on the Confrontation Clause, the *Bruton*

25   rule, like the Confrontation Clause itself, does not apply to nontestimonial statements."); <u>United</u>

26   <u>States v. Taylor</u>, 509 F.3d 839, 850 (7th Cir. 2007) (finding no *Bruton* error because the

27

28   1894 (1999) (plurality opinion).

1    challenged remarks were nontestimonial under *Crawford* ).

2

3       **C.    The State Court Decision.**

4

5       With respect to the challenged evidence of extrajudicial statements by Coleman and others,

6    the California Court of Appeal concluded that "[t]here was no confrontation clause violation

7    because the statements were non-testimonial, and admissible under exceptions to the hearsay

8    rule." (Lodg. No. 9 at 7.)  The California Court of Appeal initially noted the *Bruton/Aranda* rule,

9    *i.e.,* that "[a]dmission of an out-of-court statement by a non-testifying defendant which

10   incriminates a codefendant in a joint trial generally violates the confrontation clause if the

11   statement would be inadmissible against the codefendant in a separate trial." (Lodg. No. 9 at 7,

12   *citing* Bruton and Aranda.)  The state appellate court further observed that: "[i]f the statements

13   would have been admissible in a separate trial under an exception to the hearsay rule, they are

14   also admissible in a joint trial"; and "[a]lthough admission of out-of-court *testimonial* statements

15   is barred even if admissible under a hearsay exception, there is no confrontation clause violation

16   when *non-testimonial* statements are admitted under a state law exception to the hearsay rule."

17   (*Id.*, *citing, inter alia*, Crawford, Davis, and Whorton.)

18

19      The California Court of Appeal then noted that it was "uncontested that the challenged

20   statements are non-testimonial" and described them as "informal statements to an associate or

21   friend, not formal statements to a government officer." (Lodg. No. 9 at 7.)

22

23          Here, [Petitioner] and Coleman never intended to or spoke to anyone

24      connected with law enforcement.  They were not being interrogated or asked

25      questions by a government official.  They spoke to each other and to friends and

26      relatives in an attempt to assess and respond to their predicament, and believed

27      they could speak openly and freely.  These circumstances are essentially the

28      opposite of giving testimony. . . .

1    In addition, many of the statements are not incriminating in themselves.

2    [Petitioner] and Coleman usually spoke in vague language about what

3    acquaintances and the victims of the offenses were saying to the police and to

4    others.  Both appellants were aware of why they had been arrested, and their

5    communications focus on means to extricate themselves from prosecution for the

6    offenses.  Some of the statements imply involvement in the commission of the

7    offenses, but avoid any direct admission of involvement by either appellant.

8

9    (*Id.* at 8; citation omitted.)  Thus, the California Court of Appeal reasoned, the Confrontation

10   Clause was not implicated, because the statements at issue were nontestimonial.  (*Id.*)

11

12   Next, the California Court of Appeal found that, "[i]n any event," the challenged evidence

13   was admissible in a joint trial under the co-conspirator exception to the hearsay rule.  (Lodg. No.

14   9 at 8, *citing, inter alia,* California Evidence Code § 1223.)  The state appellate court found the

15   evidence demonstrated that:  under California law, a conspiracy existed "to avoid prosecution by

16   dissuading witnesses and fabricating alibis and other exculpatory evidence"; "the statements were

17   made by participants in the conspiracy and furthered the objectives of the conspiracy"; this

18   "conspiracy may be deemed to extend beyond the crime to activities contemplated and

19   undertaken by the conspirators in pursuance of the objectives of the conspiracy"; and there was

20   "circumstantial evidence that appellants conspired with each other to rob and burglarize the home

21   of [Grant] and Jane Doe."  (Lodg. No. 9 at 8-10.)

22

23   [S]ubstantial evidence supports the conclusion the [Petitioner]–Coleman conspiracy

24   included the goal of avoiding prosecution and conviction in any way possible,

25   including by dissuading witnesses from testifying.  At the time of the statements,

26   [Petitioner] and Coleman had or perceived some ability to alter their fate by acting

27   in concert.  The object of the conspiracy had not been attained or defeated and

28   remained ongoing while appellants were awaiting trial for the charges.  The

challenged statements also furthered the object of the conspiracy.  The statements sought to dissuade witnesses from testifying or otherwise cooperating with the police, and also to create favorable testimony whenever possible.

(*Id.* at 9.)[12]

## D.    **The State Court Decision Is Entitled To Deference.**

As the state court acknowledged, courts interpreting the interplay of the clearly established Confrontation Clause precedent of Bruton and Crawford have concluded that the *Bruton* rule is inapplicable if the statement at issue is not precluded by Crawford, *i.e.,* because it is nontestimonial and, thus, does not implicate the Confrontation Clause.  The Circuit Courts "appear to have unanimously concluded that where a statement is non-testimonial, neither *Crawford* nor *Bruton* apply."  Hundley v. Montgomery, 2014 WL 1839116, at *12 (E.D. Cal. May 8, 2014) (No. 2:12-cv-3051-JKS).  Significantly, Crawford did not address the effect of its dramatic change in Confrontation Clause jurisprudence on the *Bruton* rule.  Since the Crawford decision issued, there has not been any Supreme Court decision addressing whether the *Bruton* rule applies when a codefendant's statement is nontestimonial in nature -- a situation, post-Crawford, that would *not* implicate the Confrontation Clause at all had the statement been made by a third party who was not a codefendant.

In any event, the state court's conclusion that the statements at issue were nontestimonial plainly was an objectively reasonable application of Supreme Court precedent.  Indeed, in their appeals, neither Petitioner nor Coleman claimed that the challenged statements were testimonial within the meaning of Crawford.  (*See* Lodg. Nos. 4-5, 6-7, and 10-11, *passim.*)  While it was

---

[12]    The California Court of Appeal also found that the challenged evidence was admissible on an additional ground, namely, under the declaration against penal interest exception to the hearsay rule.  (Lodg. No. 9 at 10, *citing* California Evidence Code § 1230.)

"uncontested" that the statements were nontestimonial (Lodg. No. 9 at 7), had any claim been made that the statements were testimonial, it would have been frivolous.   The statements challenged by Petitioner were made between friends, associates, and fellow gang members in casual letters and conversations.  Supreme Court precedent suggests that the statements at issue were nontestimonial, because at the time the declarants were speaking, they had no reason to expect that their statements would be used as evidence in a trial or a criminal investigation.  *See* Williams, 132 S. Ct. at 2242; Melendez–Diaz, 129 S. Ct. at 2532.  There was no formality to any of these communications, no governmental involvement, and no view toward the statements being used at trial when they were made.  Indeed, there was no reason why Coleman and those with whom he communicated would have believed that the primary purpose of the statements would be for prosecuting Coleman and Petitioner.  The blunt, and at times cryptic and/or profane, statements between fellow gang members and their female associates using gang vocabulary and vernacular were, as the California Court of Appeal aptly and accurately described them, "essentially the opposite of giving testimony."  (Lodg. No. 9 at 8.)  There simply is no tenable basis for finding the challenged statements to fall on the "testimonial" side of the "testimonial/nontestimonial" litmus test for Confrontation Clause analysis established by Crawford.

The state court's conclusion -- that the statements by Coleman and others were not "testimonial" and, thus, did not implicate the Confrontation Clause -- was reasonable for purposes of Section 2254(d)(1).  This finding in itself dooms Ground One to the extent that the claim can be construed to raise a generalized Confrontation Clause claim with respect to the evidence of statements by Coleman and others.  To the extent that Ground One is construed as raising a more specific type of Confrontation Clause claim, *i.e.,* as a Bruton challenge to the admission of the evidence of statements made by Coleman, Ground One nonetheless still fails.   If, as the overwhelming weight of federal authority interpreting Crawford and Bruton holds, nontestimonial statements do not implicate Bruton, then that is the end of the matter, and Ground One fails for that reason alone.  If, for Section 2254(d)(1) purposes, such authority is deemed to deal with an issue in flux, *i.e.,* one that is unsettled under existing Supreme Court precedent, then Ground One

1  also necessarily fails, because the question is an open one for purposes of AEDPA review.  *See,*
2  *e.g.,* Knowles v. Mirzayance, 129 S. Ct. 1411, 1419 (2009) (Section 2254(d)(1) is not satisfied
3  when a state court has "decline[d] to apply a specific legal rule that has not been squarely
4  established by" the Supreme Court); Carey v. Musladin, 127 S. Ct. 649, 654 (2006); *see also*
5  Crater v. Galaza, 491 F.3d 1119, 1123 (9th Cir. 2007) (if habeas relief depends upon the
6  resolution of an open question under Supreme Court decisions, "Section 2254(d)(1) precludes
7  relief").

8

9  Petitioner's allegations in this action are brief.  He does not address the state court's
10  conclusion that the challenged statements were nontestimonial and, thus, fall outside the
11  Confrontation Clause's prophylactic ambit.  Rather, Petitioner's principal Confrontation Clause
12  argument seems to be that the state court erred in finding that the statements at issue fell within
13  the hearsay exception for statements of co-conspirators.  (Petition at attachment 1A.)  Indeed,
14  in the state courts, the primary argument made by Petitioner and Coleman on appeal was that the
15  trial court erred in admitting the statements pursuant to California's hearsay exception for co-
16  conspirator statements, California Evidence Code § 1223.  (*See* Lodg. No. 4 at 48-53, No. 7 at 11-
17  14, No. 8 at 2-5, No. 10 at 13-16, and No. 11 at 3-6 .)

18

19  As noted earlier, in addition to its finding that the challenged statements by Coleman and
20  others were nontestimonial for Confrontation Clause purposes, the California Court of Appeal
21  concluded that the statements fell within California's co-conspirator exception to the hearsay rule.
22  (Lodg. No. 8-10.)  "A federal court, of course, cannot review questions of state evidence law."
23  Henry v. Kernan, 197 F.3d 1021, 1031 (9th Cir. 1999); *see also* Estelle v. McGuire, 112 S. Ct. 475,
24  480 (1991) ("it is not the province of a federal habeas court to reexamine state-court
25  determinations on state law questions").  This resolution of a state law question -- *to wit,* whether
26  the evidence adduced satisfied a state law hearsay exception -- is one on which this federal
27  habeas court must defer to the state courts.  *See* Bradshaw v. Richey, 126 S. Ct. 602, 604 (2005)
28  (*per curiam*) ("a state court's interpretation of state law, including one announced on direct appeal

1    of the challenged conviction, binds a federal court sitting in habeas corpus"); Hicks v. Feiock, 108

2    S. Ct. 1423, 1428 & n.3 (1988) (federal habeas court is not at liberty to disregard a California

3    Court of Appeal's rulings on state law when the California Supreme Court has denied review).

4    Here, the state court's conclusion that the challenged statements met the requirements of

5    California Evidence Code § 1223 is binding on this Court in this federal habeas proceeding.  *See*

6    Lilly v. Virginia, 527 U.S. 116, 125, 119 S. Ct. 1997, 1894 (1999) (plurality opinion) (after noting

7    that the state court had found a statement to fall within the statement against penal interest

8    hearsay exception, the Supreme Court stated:  "We assume, as we must, that [the declarant's]

9    statements were against his penal interest as a matter of state law").  Petitioner's argument here

10    is simply that the state courts erred in interpreting California law in his case.  Petitioner's request

11    that this Court second-guess the state courts' application of California law is not cognizable.

12

13        The state court's finding to which this Court must defer -- *viz.,* that the statements were

14    made as a part of a conspiracy "to avoid prosecution by dissuading witnesses and fabricating alibis

15    and other exculpatory evidence" (Lodg. No. 9 at 8) -- renders federal habeas relief unavailable.

16    As Crawford recognized, "statements in furtherance of a conspiracy" are a classic example of

17    nontestimonial statements that fall outside the protection of the Confrontation Clause.  Crawford,

18    124 S. Ct. at 1367; *see also* United States v. Grasso, 724 F.3d 1077, 1085 n.9 (9th Cir. 2013)

19    ("[a]lthough the Sixth Amendment limits the admissibility of testimonial

20    evidence, . . . co-conspirator statements in furtherance of a conspiracy are not testimonial")

21    (citations omitted); United States v. Allen, 425 F.3d 1231, 1235 (9th Cir. 2005) ("co-conspirator

22    statements are not testimonial and therefore beyond the compass of *Crawford's* holding"); *see*

23    *further* United States v. Clark, 717 F.3d 790, 816-17 (10th Cir. 2013) (explaining that, under

24    Crawford, an out-of-court statement made by one codefendant to a third party co-conspirator, in

25    furtherance of the underlying conspiracy, did not implicate the *Bruton* rule, because statements

26    made to further a conspiracy are not testimonial).  Because the statements of Coleman and others

27    were found, under state law, to constitute the statements of co-conspirators made to further a

28    conspiracy, these statements fell outside the ambit of the Confrontation Clause and were

1  admissible without constitutional violation.  *See* United States v. McCown, 711 F.2d 1441, 1448-49

2  (9th Cir. 1983) (Bruton was not violated by the admission of statements made by a codefendant,

3  because such statements were made in furtherance of a conspiracy in which the defendant was

4  a participant and the statements fell within the federal hearsay exception for co-conspirator

5  statements).

6

7        The California Court of Appeal noted the clearly established federal law and correctly

8  applied it.  Under Section 2254(d)(1), its decision must be accorded deference.  Accordingly,

9  Section 2254(d)(1) precludes federal habeas relief based on Ground One.

10

11  **II.    Petitioner's Sufficiency Of The Evidence Claim Does Not Warrant Federal**

12        **Habeas Relief.**

13

14        In Ground Three, Petitioner contends that the evidence adduced at trial was insufficient

15  to support the gang enhancement allegation which the jury found to be true.[13]  Specifically,

16  Petitioner contends that the evidence was insufficient to satisfy the requirement of California Penal

17  Code § 186.22(b)(1) ("Section 186.22(b)(1)") that the crimes of which he was convicted were

18  "committed for the benefit of, at the direction of, or in association with any criminal street gang

19  with the specific intent to promote, further, or assist in any criminal conduct by gang members."

20  Petitioner argues there was no evidence that gang signs were used during the commission of the

21  crimes or that the money was taken for the benefit of or in furtherance of a gang.  He notes the

22

23        [13]    The jury found the California Penal Code § 186.22(b) gang enhancement allegation

24  to be true with respect to the crimes of robbery, burglary, rape, sexual penetration by foreign
   object, and dissuading a witness.  As to the robbery and burglary counts, the jury found that such

25  crimes were committed "for the benefit of, or in association with, the Crips gang" and with the
   specific intent to promote, further, or assist in criminal conduct by a criminal street gang.  (CT

26  568-71.)  As to the crimes of rape and sexual penetration by foreign object, the jury found that
   the crime was committed with the requisite specific intent "in association with the Crips gang."

27  (CT 572, 574.)    As to the dissuading a witness count, the jury's found that the crime was

28  committed with the requisite specific intent "for the benefit of the Crips gang."  (CT 578.)

testimony of the gang expert and others that gangs frown upon sexual assaults and that the commission of such a crime may result in punishment by other gang members.   Petitioner contends that the evidence showed "merely that there was more than one gang member involved in the robbery," and thus, it was insufficient to satisfy the requirements of Section 186.22(b)(1). (Petition at 5-6 and attachment 1C-3C.)

### A.   The Clearly Established Federal Law That Governs Ground Three

The Fourteenth Amendment's Due Process Clause guarantees that a criminal defendant may be convicted only "upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." In re Winship, 90 S. Ct. 1068, 1073 (1970).  The Supreme Court announced the federal standard for determining the sufficiency of the evidence to support a conviction in Jackson v. Virginia, 99 S. Ct. 2781 (1979).

Under Jackson, "[a] petitioner for a federal writ of habeas corpus faces a heavy burden when challenging the sufficiency of the evidence used to obtain a state conviction on federal due process grounds."  Juan H. v. Allen, 408 F.3d 1262, 1274 (9th Cir. 2005).  "[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson, 90 S. Ct. at 2789; *see also* Cavazos v. Smith, 132 S. Ct. 2, 4 (2011) (*per curiam*) (a habeas court "may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury").  "Put another way, the dispositive question under *Jackson* is 'whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt.'" Chein v. Shumsky, 373 F.3d 978, 982-83 (9th Cir. 2004) (*en banc*) (quoting Jackson).   The Court need not find that the conclusion of guilt was compelled, only that it rationally could have been reached. Drayden v. White, 232 F.3d 704, 709–10 (9th Cir. 2000); *see also* United States v. Mares, 940 F.2d 455, 458 (9th Cir. 1991) ("The relevant inquiry is not whether the evidence excludes every hypothesis except guilt, but whether the jury could

1 reasonably arrive at its verdict.").

2

3      A habeas court reviewing a sufficiency of the evidence claim must consider all evidence

4 admitted at trial, notwithstanding a contention by a petitioner that some of the admitted evidence

5 should have been excluded.  McDaniel v. Brown, 130 S. Ct. 665, 672 (2010) (*per curiam*).

6 "'Circumstantial evidence and inferences drawn from it may be sufficient to sustain a conviction.'"

7 Walters v. Maass, 45 F.3d 1355, 1358 (9th Cir. 1995) (citation omitted).  The reviewing court need

8 not decide whether it would have found the trial evidence sufficient or scrutinize "the reasoning

9 process actually used by the fact-finder."  Jackson, 99 S. Ct. at 2788–89 & n.13.  Jackson also

10 does not require that the prosecutor affirmatively "'rule out every hypothesis except that of guilt.'"

11 Wright v. West, 112 S. Ct. 2482, 2492 (1992) (citation omitted).   When the factual record

12 supports conflicting inferences, the federal court must presume -- even if it does not affirmatively

13 appear on the record -- that the trier of fact resolved any such conflicts in favor of the prosecution

14 and defer to that resolution.  Jackson, 99 S. Ct. at 2793; *see also* Brown, 130 S. Ct. at 674.  The

15 habeas court must "preserve 'the factfinder's role as weigher of the evidence.'"  *Id.* (citation

16 omitted); *see also* Smith, 132 S. Ct. at 4 (it "is the responsibility of the jury — not the court — to

17 decide what conclusions should be drawn from the evidence admitted at trial").  "*Jackson* leaves

18 juries broad discretion in deciding what inferences to draw from the evidence presented at trial,"

19 and it requires only that they draw "'reasonable inferences from basic facts to ultimate facts.'"

20 Coleman v. Johnson, 132 S. Ct. 2060, 2064 (2012) (*per curiam*) (citation omitted).

21

22      The Court must refer to the substantive elements of the criminal offense as defined by

23 state law and look to state law to determine what evidence is necessary to convict on the crime

24 charged.  *See* Jackson, 99 S. Ct. at 2792 n.16; Juan H., 408 F.3d at 1275.  Further, the Court

25 must defer to the state court's interpretation of state law.  *See* Bradshaw, 126 S. Ct. at 604; Hicks,

26 108 S. Ct. at 1428 & n.3.

27

28      Finally, Section 2254(d)(1) requires federal habeas courts to "apply the standards of

1  *Jackson* with an additional layer of deference." Juan H., 408 F.3d at 1274; *see also* Parker v.

2  Matthews, 132 S. Ct. 2148, 2152 (2012) (*per curiam*) (describing habeas review of a sufficiency

3  of the evidence claim as based on a "twice-deferential standard"); Johnson, 132 S. Ct. at 2062

4  ("We have made clear that *Jackson* claims face a high bar in federal habeas proceedings because

5  they are subject to two layers of judicial deference."). This doubly deferential standard sets a

6  "high bar" for a petitioner, *id.*, and limits the federal habeas court's inquiry to whether the state

7  court's rejection of a sufficiency of the evidence challenge to a conviction was an objectively

8  unreasonable application of Jackson. Emery v. Clark, 643 F.3d 1210, 1214 (9th Cir. 2011); *see*

9  *also* Johnson, 132 S. Ct. at 2062 (under Supreme Court precedent, a federal court may not grant

10  relief simply because it disagrees with the state court's decision rejecting a sufficiency of the

11  evidence claim; rather, relief is permitted only if the state court's decision was objectively

12  unreasonable).

13

14  **B.    The Relevant Evidence**

15

16      Detective Scott Casey, the lead detective in the Lompoc Police Department's gang unit,

17  testified as a gang expert for the prosecution.[14] (RT 1219.) He testified regarding the Crips gang,

18  both in general and as the gang operated in Lompoc. (RT 1224-32.) He testified, *inter alia*, that

19  Crips members typically refer to each other as "Cuz," misspell words that have the letters "C" and

20  "K" next to each other (because Blood gang members use "CK" to stand for Crips Killer), cross

21  through the letter "B," use a hand sign invoking the letter "C," use the word "loc" in their

22  monikers, and have tattoos that reflect their county (805 area code) and/or lettering somehow

23  indicating "Crips," such as "NHC" (for Neighborhood Crip"). (RT 1228-32.)

24

25      Detective Casey explained the roles that reputation, respect, and retaliation play in gang

26

27  _____

28      [14]    There is no issue in this case regarding Detective Casey's qualifications as an expert
    or the propriety of his gang expert testimony.

29

culture.  He explained that gang members build their reputations by earning respect, which is earned through the commission of violent acts and certain crimes.  Retaliation is required any time an act occurs that is perceived as disrespectful, even is it is something as nominal as a dirty look. In gangs, the concept of "putting in work" means to commit criminal activity on behalf of the gang and thereby to show the gang higher ups that the member believes in the gang and is not scared to do things for the gang and, thus, to gain more respect.  Gang members who provide information to law enforcement are "snitches," and other gang members will try to dissuade such behavior through intimidation. (RT 1239-40.)  In gang culture, a gang member does not testify in court; instead, gang members deal with their problems and each other outside the courtroom. (RT 1272.)  With respect to Petitioner's call to Grant (discussed in connection with Ground One), in which Petitioner told Grant to "keep it street," Casey interpreted that phrase to mean that Grant should keep the issue out of the courtroom and not involve law enforcement.  (RT 1240-43.) Casey understood the references in the letters discussed earlier to "keeping it 100" and "if it's all 100" to mean that all concerned should stay solid, not break during questioning, and not involve the court process.  (RT 1243.)

Detective Casey opined that the primary activities of the Crips gang are murder, robbery. burglary, narcotic sales, and assault with a deadly weapon. (RT 1243-44.)  The primary activity of the Central Coast Crips clique are narcotic sales, robbery, battery, and assault with a deadly weapon. (RT 1244.)  Typically, sexual assault is "a no-no" in gang culture; a rapist is looked down upon and could be banished.  (*Id.*)[15]

With respect to the predicate acts committed by Crips members, which were alleged in the case to show a pattern of gang activity for purposes of the Section 186.22(b)(1) allegation,

---

[15]    As described earlier, prosecution witness Tyrone Leekins testified about communications he had with Coleman.  Leekins denied being a gang member, but on cross-examination, he opined that gang members do not tolerate rape, especially by gang leaders. (RT 469-70.)  Grant testified that he associated with the Bloods gang when he was younger (RT 669, 677), and he also testified that gang members look down upon rape (RT 684).

Detective Casey testified about crimes committed by Crips members, including Esley Bailey, Michael Coleman, Jr. (codefendant Coleman's cousin), Marsander Rayford, Odel Seals, and Petitioner (two earlier drug trafficking convictions). (RT 1244-52.) The trial court subsequently instructed the jury that the court had taken judicial notice that these convictions were true and correct for purposes of the predicate act aspect of the Section 186.22(b)(1) enhancement allegation and that the jury should accept such convictions as fact. (RT 1458-59.) Casey identified various of these Crips members in photographs shown to him, including photographs depicting Petitioner and Coleman with those other men. (RT 1254-56, 1260.) Casey also identified letters Petitioner wrote to some of these other men while Petitioner was in prison serving a six-year sentence imposed for a conviction he sustained in 2005. (RT 1256-59.)

Detective Casey testified about his research into prior law enforcement contacts with Petitioner and Coleman. A 1996 field interview card showed that Petitioner was with Crips members Esley Bailey and Michael Coleman, Jr. -- both persons who committed predicate offenses -- at the time the men were stopped by the police, and Petitioner said his moniker was San Loc. (RT 1260-61.) A January 1998 field interview card documented a traffic stop, in which Petitioner was with Crips member Esley Bailey -- also someone who committed one of the predicate offenses. (RT 1262.) A May 1998 field interview card documented that Petitioner -- with Crips members including Marsander Rayford, another of the predicate offense perpetrators -- sold cocaine base to an undercover officer, admitted his Crips membership, and stated that his moniker was Cyco. (RT 1262-63.) In August 2004, Petitioner was under investigation in connection with a drive-by shooting. (RT 1264.) In a March 2005 traffic stop, to the predicate offense involving Odel Seals, Petitioner was with Seals which led . (RT 1264.)

With respect to codefendant Coleman, Detective Casey identified a picture of Coleman throwing hand signs that stood for East Side Crips. (RT 1232.) In March 2003, Coleman was convicted of a vehicle theft that was found to be gang-related and ordered to register his gang affiliation with law enforcement. Coleman told the police that he was affiliated with the Future

1  Connect Gang. (RT 1265-66.) Casey researched that gang on MySpace, and its MySpace account

2  indicated the gang was a rap gang affiliated with the Crips gang, including by directing members

3  to wear the color blue, call each other "Cuz," and act disrespectfully to the Bloods gang. (RT

4  1268-70.)  In 2007, Coleman was involved in a police pursuit, and two Crips-affiliated men were

5  with him in the car. (RT 1267.)  Coleman's moniker is "Chuccy," and he has tattoos on his

6  forearm that indicate a Crips affiliation. (RT 1268.)

7

8      Detective Casey opined that Petitioner was an active Crips member on the date of the

9  crimes at issue.  The detective based this opinion on Petitioner's past history, his contacts with

10 law enforcement officers, the letters he authored to other gang members while in prison, his

11 phone calls to Gloria Thomas from jail, his observed associations with others, his admissions to

12 law enforcement officers of his Crips membership, and the crimes at issue. (RT 1275, 1277.)

13 Detective Casey opined that Coleman also was an active member of the Crips gang at the time

14 of the crimes at issue.  Case relied upon Coleman's contacts with law enforcement officers, his

15 associations, MySpace information (including photos in which Coleman is labeled Captain and

16 Petitioner is labeled General, indicating that Petitioner is a higher up member of the gang and a

17 shot caller), photographs of Coleman flashing gang signs, his tattoos, and letters Coleman sent

18 to Petitioner. (RT 1277-79.)

19

20     Detective Casey further opined that the burglary and robbery at issue were committed for

21 the benefit of the Crips street gang within the meaning of Section186.22(b)(1).  He based this

22 opinion upon all of the testimony and evidence in the case (including the letters and phone calls

23 discussed in connection with Ground One).  Casey opined that the crimes would benefit the gang,

24 because a home invasion robbery is a violent act and, thus, enhances the respect for and

25 reputation of the gang.  In addition, Petitioner's letters indicated that the crimes benefitted the

26 gang by generating money. (RT 1279-81.)  Detective Casey also opined that the robbery and

27 burglary were committed in association with the Crips gang, because Petitioner and Coleman, who

28 were both admitted Crips members and were associating with each other at the time of the

crimes, aided and abetted each other in committing the crimes. (RT 1282-83.) Detective Casey opined that the sexual assault crimes were not committed for the benefit of the Crips but were committed in association with the Crips gang, because Petitioner and Coleman associated with each other and aided and abetted each other in committing these crimes. (RT 1283-85.) Finally, Detective Casey opined that Coleman committed the robbery and burglary at the direction of the Crips gang. (RT 1286-87.)

Detective Casey opined that Troy Grant was affiliated with the Bloods gang. The detective based this opinion on his prior contacts with Grant, associations by Grant with others that the detective had observed, and the detective's conversations with other officers who knew Grant since he was a teenager. (RT 1271.)

## C.    **The State Court Decision**

The California Court of Appeal commenced its analysis of Ground Three by noting the standard of review it was applying, *to wit*, that the entire record was reviewed in the light most favorable to the judgment to determine if

> it contains substantial evidence — that is, evidence that is reasonable, credible, and of solid value — from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. . . . We presume every fact in support of the judgment the trier of fact could have reasonably deduced from the evidence. . . . If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding. . . . "A reviewing court neither reweighs evidence nor reevaluates a witness's credibility."

(Lodg. No. 9 at 11-12; citations omitted.)

1    The California Court of Appeal next noted that, under California law, expert testimony is

2    admissible and sufficient to prove the elements of Section 186.22(b)(1), although an expert's

3    opinion must be based upon the evidence and not speculation or conjecture.  (Lodg No. 9 at 12,

4    *citing, inter alia*, People v. Albillar, 51 Cal. 4th 47, 63 (2010), and People v. Gardeley, 14 Cal. 4th

5    605, 617-18 (1996).)  The state appellate court further observed that, under California law, more

6    than mere gang membership is required to impose a gang enhancement pursuant to Section

7    186.22(b)(1), because gang members can commit crimes for purely personal reasons.  (*Id.*)

8

9    The California Court of Appeal concluded that "the opinions of the prosecution's gang

10   expert and the evidence supporting those opinions constitute substantial evidence supporting

11   imposition of the gang enhancement." (Lodg. No. 9 at 12.)  The state appellate court summarized

12   the testimony by Detective Casey (*id.* at 12-13), as described above, and reasoned as follows:

13

14            Based on the evidence and his knowledge of gang activities, Casey testified

15       that it was his opinion that the robbery and burglary were committed for the benefit

16       of the Crips gang, in association with the gang, and at the direction of the gang. His

17       reasons for the opinion included the positive effect that the violence of a home

18       invasion robbery would have on a gang member's reputation, [Petitioner's]

19       expressed desire to generate money for the gang, and the commission of the crimes

20       by multiple gang members.  Casey also emphasized that [a] high level gang

21       member ([Petitioner]) had taken a younger and lower level gang member

22       (Coleman) under his wing to commit the crimes.  A crime committed by a senior and

23       younger gang member permits the younger person to observe and learn from the

24       actions taken by the senior member.  Committing a crime with fellow gang members

25       may also increase the intimidation factor which is important to gang authority in

26       general.  (See *People v. Albillar, supra,* 51 Cal. 4th at p. 63.)  Casey also noted that

27       the perpetrators called each other "cuz" which is a word used by Crips gang

28       members to describe other Crips.  Casey testified that, although the sexual assault

1    was not committed for the benefit of the Crips gang, it was committed in association

2    with the gang.  His opinion in this regard was based on the same circumstances as

3    he cited in support for his opinion that the robbery and burglary were gang related.

4

5          The gang enhancement also requires proof that the offenses were committed

6    "with the specific intent to promote, further, or assist in any criminal conduct by

7    gang members."  (§ 186.22, subd. (b)(1).)  Although the evidence was largely

8    circumstantial as to intent, circumstantial evidence is sufficient.  "There is rarely

9    direct evidence that a crime was committed for the benefit of a gang.  For this

10    reason, 'we routinely draw inferences about intent from the predictable results of

11    action.  We cannot look into people's minds directly to see their purposes.  We can

12    discover mental state only from how people act and what they say.' [Citation.]"

13    (*People v. Miranda* (2011) 192 Cal. App. 4th 398, 411–412.)  If substantial evidence

14    establishes the defendant intended to and did commit the offense with other

15    members of a gang, "the jury may fairly infer that the defendant had the specific

16    intent to promote, further, or assist criminal conduct by those gang members."

17    (*People v. Albillar, supra,* 51 Cal. 4th at p. 68.)  It is not necessary "that the

18    defendant act with the specific intent to promote, further, or assist a *gang;* the

19    statute requires only the specific intent to promote, further, or assist criminal

20    conduct by *gang members.*"  (*Id.* at p. 67.)

21

22          Moreover, an expert may provide an opinion that embraces the ultimate issue

23    for the jury to determine if it is based on the evidence.  (See *People v. Vang* (2011)

24    52 Cal.4th 1038, 1045–1047, 1049; Evid. Code, § 805.)  Here, Detective Casey

25    testified about the nature of the offenses based on evidence of the offenses and

26    appellants' gang affiliation.  He did not simply state how he believed the case should

27    be decided.  And, the jury was not required to accept his opinion or the evidence

28    supporting the opinion.  (See *Vang, supra,* at pp. 1049–1050.)  The trial court

1    instructed the jury that "[t]he meaning and importance of any [expert] opinion are

2    for you to decide," and that "[y]ou may disregard any opinion that you find to be

3    unbelievable, unreasonable, or unsupported by the evidence." (CALCRIM No. 332.)

4

5    (Lodg. No. 9 at 13-14.)

6

7    ## C.    The State Court's Decision Is Entitled To Deference

8

9    Under California law, expert testimony is admissible on a subject "sufficiently beyond

10   common experience that the opinion of an expert would assist the trier of fact." *See* California

11   Evidence Code § 801(a); Briceno v. Scribner, 555 F.3d 1069, 1077 (9th Cir. 2009) (noting that

12   California law permits such expert opinion testimony).  "Testimony in the form of an opinion that

13   is otherwise admissible is not objectionable because it embraces the ultimate issue to be decided

14   by the trier of fact."  California Evidence Code § 805; *see also* People v. Roberts, 184 Cal. App.

15   4th 1149, 1193 (2010) (finding an "objection that the opinion of an expert coincides with the

16   'ultimate issue' in the case" to be "untenable" due to California Evidence Code § 805).   In

17   California, prosecutors often, and permissibly, present gang expert testimony to help prove a

18   Section 186.22(b)(1) allegation, including the ultimate issues to be resolved in connection with

19   the enhancement.  *See, e.g.,* People v. Xue Vang, 52 Cal. 4th 1038, 1044-52 (2011) ("Expert

20   opinion that particular criminal conduct benefitted a gang is not only permissible but can be

21   sufficient to support the Penal Code section 186.22(b)(1) gang enhancement.") (*citing* Albillar, 51

22   Cal. 4th at 63).

23

24   In Albillar, the California Supreme Court clarified California law regarding what evidence

25   is sufficient to support a finding that a Section 186.22(b)(1) gang enhancement allegation is true.

26   With respect to Section 186.22(b)(1)'s requirement that the crime benefit a criminal gang, the

27   California Supreme Court held that:  "Expert opinion that particular criminal conduct benefitted

28   a gang by enhancing its reputation for viciousness can be sufficient to raise the inference that the

conduct was 'committed for the benefit of . . . a [ ] criminal street gang.'" <u>Albillar</u>, 51 Cal. 4th at 63 (citation omitted).  As noted above, a federal habeas court must refer to the substantive elements of the criminal offense as defined by state law, look to state law to determine what evidence is necessary to convict on the crime charged, and defer to the state court's interpretation of state law.  <i>See</i> <u>Wainwright v. Goode</u>, 104 S. Ct. 378, 382 (1983) ("the views of the state's highest court with respect to state law are binding on the federal courts").  In analyzing Ground Three, this Court is required to follow <u>Albillar</u>'s interpretation of Section 186.22(b)(1).  <i>See</i> <u>Bradshaw</u>, 546 U.S. at 76; <i>see also</i> <u>Emery</u>, 643 F.3d at 1215-16 (applying <u>Albillar</u>'s "authoritative interpretation of section 186.22" to a habeas petitioner's claims).

As the California Court of Appeal observed, Petitioner and Coleman admitted they were members of a criminal street gang within the meaning of Section 186.22(b)(1).  (Lodg. No. 9 at 12 n.7.)  Thus, there can be no factual dispute that both men were Crips members when they committed the crimes at issue.

With respect to the robbery and burglary offenses, as the California Court of Appeal outlined, gang expert Casey explained the bases for his conclusion that the crimes were committed to benefit the gang to which Petitioner and Coleman admittedly belonged.  These included: both men's use of the gang term "Cuz," during the crimes; Petitioner's expressed desire to obtain money for the gang;[16] the positive effect that such a violent home invasion crime would have on the gang's reputation; and the teaching opportunity this afforded Petitioner, as the senior and higher level gang member, to provide to Coleman, the lower level gang member who had been taken under Petitioner's wing.  Under <u>Albillar</u>, Casey's expert opinion testimony is sufficient to raise the inference that Petitioner's conduct was committed for the benefit of the Crips gang.  <i>See</i> <u>Albillar</u>, 51 Cal. 4th at 63.  No countervailing evidence was presented, and under <u>Jackson</u>, a

---

[16]    It is of no moment that, as Petitioner notes, there was no evidence presented that Petitioner actually gave to the Crips gang the money he stole from Grant and Doe.  The issue is his intent at the time the crime was committed, not what he did afterward.

1    single witness's testimony is sufficient to support a conviction or sentencing enhancement. *See*

2    Bruce, 376 F.3d at 957–58.  Moreover, the testimony of both Casey and Doe supported a finding

3    that Petitioner and Coleman were acting in association for the gang.  Petitioner placed Doe in a

4    violent choke hold while Coleman held a baseball bat, and both men demanded money and weed.

5    When Doe did not provide the location of these items, both men worked in concert to subdue her,

6    hold her down, sexually assault her, and when she capitulated and gave them the location of the

7    items demanded, they retrieved them.  As these crimes were committed, Petitioner and Coleman

8    referred to each other by the Crips term "Cuz."  (RT 303-15.)  A rational juror could have found,

9    based on the testimony of Doe and Casey, that Petitioner committed these crimes to benefit his

10   gang and/or that he and Coleman acted in association within the meaning of Section 186.22(b)(1).

11

12

13        With respect to the two sexual assault offenses, the evidence of record shows that

14   Petitioner and Coleman worked together to commit these crimes.  Jane Doe testified that the two

15   men referred to each other as "Cuz," one placed her in a choke hold, they demanded money and

16   weed, and she said, "I don't know, I don't know."  Petitioner then knelt her over the bed and told

17   Coleman to obtain something with which to tie Doe up.  Coleman did so, and the two men

18   attempted to tie her up.  When they could not do so, one of the men said, "we don't have time

19   for that," Doe felt her pants being pulled down, she felt both men's hands hold her down, and she

20   was then raped and further sexually assaulted with a plastic object.  After the assaults were

21   completed, Petitioner again asked Doe where the money and weed was; this time she told him

22   the location of the weed and money.  Coleman went to retrieve the weed, and Petitioner took Doe

23   with him to retrieve the money.   (RT 309-15.)  A reasonable trier of fact could conclude that the

24   two sexual assaults were committed to force Doe to disclose the location of the money and weed

25   and, thus, to aid Petitioner and Coleman in the commission of the robbery and burglary they were

26   committing to benefit their gang.  Thus, while, as the gang expert and other witnesses testified,

27   rape is a crime that is not approved of by gangs, in this instance, it was a tool used to effectuate

28   crimes that *were* committed to benefit the gang.  A reasonable trier of fact could find, as the gang

expert concluded, that Petitioner and Coleman were acting in association as Crips members when they committed the two sexual assaults on Doe and thereby extracted from her the information they needed to commit the robbery and burglary.

Finally, as to the crime of dissuading a witness, the oral statements and letters described in connection with Ground One were replete with statements by Petitioner and Coleman indicating their efforts to have friends and associates dissuade Grant and Doe from testifying and, instead, to allow the gang to resolve the matter through "street justice." In the same breath in which he referred to himself as "hoodsta" and "gangsta," Petitioner expressed his wish that his associate "g[e]t through to" Grant and Doe and persuade them to defer to "street justice," *i.e.*, as Detective Casey testified, to let the gang handle the situation. In a telephone conversation with Grant, Petitioner expressly prevailed upon Grant to defer to gang-based street justice. Coleman's letters to Leekins similarly evidenced Coleman's attempt to have Leekins assist in having the situation handled through gang-related "street justice." Thus, there was substantial evidence from which a reasonable juror could conclude not only that Petitioner and Coleman sought to dissuade Grant and Doe from testifying and to persuade them to participate in a gang-based resolution, but also that such efforts were wholly intertwined with the gang membership of Petitioner and Coleman and were conducted for the benefit of and/or in association with a criminal street gang.

In sum, the state court did not unreasonably apply Jackson in concluding that there was sufficient evidence to support the jury's finding that all the crimes at issue were committed for the benefit of, or in association with, Petitioner's criminal street gang. In addition, the state court's finding that sufficient evidence supported Section 186.22(b)(1)'s separate specific intent requirement also was a reasonable application of the Jackson standard. As the California Court of Appeal explained, under California law, circumstantial evidence of intent is sufficient, and Section 186.22(b)(1) requires only that such intent be to promote, further, or assist criminal conduct by another gang member. The actions of Petitioner and Coleman -- who worked in concert to threaten and intimidate Doe into disclosing the location of the money and weed they

1    sought, including their joint conduct with respect to the sexual assaults -- served as an ample

2    evidentiary basis for concluding that they specifically intended to assist each other in the crimes

3    they were committing.

4

5          Finally, with respect to Petitioner's assertions regarding the alleged inadequacies of gang

6    expert Casey's opinion, the jury was free to accept or reject Casey's expert opinion, and as the

7    state court noted, the jury was explicitly instructed that it was not required to accept his opinion.

8    The jury is presumed to follow the instructions it is given.  Penry v. Johnson, 532 U.S. 782, 799,

9    121 S. Ct. 1910, 1922 (2001); Weeks v. Angelone, 528 U.S. 225, 234, 120 S. Ct. 727, 732 (2000).

10   While Petitioner disputes the sufficiency of gang expert Casey's opinion, the determination of

11   whether the testimony by the gang expert was credible was the sole province of the jury.  "When

12   no improper law enforcement activity is involved, . . . it suffices to test reliability through the

13   rights and opportunities generally designed for that purpose, notably, the presence of counsel at

14   postindictment lineups, vigorous cross-examination, protective rules of evidence, and jury

15   instructions on both the fallibility of eyewitness identification and the requirement that guilt be

16   proved beyond a reasonable doubt."  Perry v. New Hampshire, 132 S. Ct. 716, 721 (2012); see

17   also United States v. Ginn, 87 F.3d 367, 369 (9th Cir. 1996).  Any credibility issues with respect

18   to Casey's expert opinion were factors for the jury to consider under the instructions it received.

19   See Jones v. Wood, 207 F.3d 557, 564 (9th Cir. 2000) (in the context of performing Jackson

20   review, determining witness credibility is a "key question for a jury").  Indeed, a "jury's credibility

21   determinations are . . . entitled to near-total deference under Jackson."  Bruce v. Terhune, 376

22   F.3d 950, 957-59 (9th Cir. 2004) (noting further that, "[e]xcept in the most exceptional of

23   circumstances, Jackson does not permit us to revisit credibility determinations"); see also Schlup

24   v. Delo, 115 S. Ct. 851, 868 (1995) ("under Jackson, the assessment of the credibility of witnesses

25   is generally beyond the scope of review").  The reviewing court "must respect the province of the

26   jury to determine the credibility of witnesses."  Walters, 45 F.3d at 1358.

27

28          Given the instruction it received and the verdict it reached, the jury necessarily found that

1  the expert opinion testimony of Casey, along with Doe's testimony regarding what occurred, was

2  sufficient to establish, beyond a reasonable doubt, that the elements of Section 186.22(b)(1) were

3  met.  Of course, Petitioner's jury was not required to draw such a finding, but given that enough

4  evidence was presented to the jury to support such a finding, due process is satisfied.  As a

5  rational and reasonable jury could reach the true finding on the Section 186.22(b)(1)

6  enhancement alleged, this Court is not permitted, under the <u>Jackson</u> standard, to find that the

7  jury should have concluded otherwise.  <u>Jackson</u>, 443 U.S. at 319, 99 S. Ct. at 2789; <u>Bruce</u>, 376

8  F.3d at 957.

9

10  Petitioner has not shown that the state court's application of the <u>Jackson</u> standard to his

11  sufficiency of the evidence claim was contrary to, or an unreasonable application of, that test.

12  Accordingly, under Section 2254(d)(1), the Court is required to defer to the state court's decision

13  with respect to Ground Three, and the claim must be, and is, DENIED.

14

15  *     *     *     *     *

16

17  For the reasons discussed above, Petitioner has not shown that the state court's rejection

18  of Grounds One and Three of the Petition was either contrary to, or an unreasonable application

19  of, clearly established federal law.  Section 2254(d)(1), therefore, forecloses federal habeas relief.

20  Accordingly, IT IS ORDERED that:  (1) the Petition is denied; and (2) Judgment shall be entered

21  dismissing this action with prejudice.

22

23  In addition, pursuant to Rule 11(a) of the Rules Governing Section 2254 Cases in the

24  United States District Courts, the Court has considered whether a certificate of appealability is

25  warranted in this case.  <i>See</i> 28 U.S.C. § 2253(c)(2); <u>Slack v. McDaniel</u>, 120 S. Ct. 1595, 1604

26  (2000).  The Court concludes that:  reasonable jurists would not find its resolution of the Petition

27  to be "debatable or wrong"; and the issues raised by Petitioner are not "adequate to deserve

28  encouragement to proceed further."  <u>Slack</u>, 120 S. Ct. at 1603.  Accordingly, issuance of a

certificate of appealability is not warranted and, thus, a certificate of appealability is DENIED.

IT IS SO ORDERED.

DATED:  July 18, 2014.

_Margaret A. Nagle_

MARGARET A. NAGLE
UNITED STATES MAGISTRATE JUDGE